SIX BARRELS OF DISTILLED SPIRITS (UNITED STATES v.). See Case No. 16,-294.

SIX BOXES OF ARMS (UNITED STATES v.). See Case No. 16.295.

---

## Case No. 12,914.

### SIX CASES OF SILK RIBBONS.

[3 Ben. 536;[1] 11 Int. Rev. Rec. 13.]

District Court, S. D. New York. Dec., 1869.

CUSTOMS DUTIES — UNDERVALUATION — MARKET VALUE—EVIDENCE.

1. Under the act of March 3, 1863 (12 Stat. 737), where goods imported from abroad are owned by their manufacturer, he must swear that his invoice contains the actual market value of the goods at the time and place when and where they were manufactured.

2. "Actual market value," is the price at which the manufacturer holds his goods for sale in the ordinary course of trade.

3. The time when an article is manufactured is when its manufacture is completed.

4. The law presumes that there was, at such time and place, an actual market value, and no evidence can be received. in an action to forfeit the goods for fraudulent undervaluation, to show that there was no such value.

5. The law requires the best evidence to be given of any fact.

6. A series of sales or a single sale in the ordinary course of trade, is one of the best evidences of market value.

7. Offers by merchants or manufacturers to sell their goods in the usual course of trade are among the best evidences of their market value.

8. In an action to forfeit goods for fraudulent undervaluation. the jury have the right, in the absence of proof of such sales or offers, to resort to the cost of manufacture, with the manufacturer's profit added. as a means of determining what was their actual market value. But. in that case, the cost of the raw material is to be taken as of the time and place of manufacture.

9. Any intentional undervaluation is cause for the forfeiture of the goods; and the intentional undervaluation of any item in an invoice authorizes the forfeiture of the whole invoice.

10. Where the court decides that probable cause has been shown for the seizure of the goods as so forfeited. the burden is upon the claimant to show that the invoice contains the actual market value of the goods.

At law.

William M. Evarts and William G. Choate, for the United States.

Edwin W. Stoughton and Sidney Webster, for claimants.

BLATCHFORD, District Judge (charging jury). This prosecution, gentlemen, for the forfeiture of the goods in question here, is founded upon two statutes of the United States—the fourth section of the act of May 28, 1830 (4 Stat. 410), and the first section of the act of March 3, 1863 (12 Stat. 737). The substance of the act of 1830 is, that if the invoice upon which foreign goods are entered at the custom-house is made up with intent, by a false valuation. to evade or defraud the revenue, the goods shall be forfeited; and the substance of the act of 1863 is, that if any owner of any imported goods shall knowingly make, or attempt to make, an entry thereof by means of any false invoice, or of any false paper, or of any other false practice or appliance whatever, all the goods named in the invoice shall be forfeited to the United States.

At Basle, in the Swiss Confederation, there has existed, for a long series of years, a manufacturing and mercantile house, doing business under the name of Forcart Weiss and Burkhardt Wildt, composed, at present, of three partners, Daniel Burkhardt, Daniel Burkhardt Forcart, and Louis Burkhardt Forcart. These gentlemen are engaged in the manufacture of silk ribbons, and they dispose of a large portion of their manufactures by sending them on consignment to the United States. to the city of New York, for sale here by a mercantile house—Kutter. Luckemeyer & Co. They have pursued this business of sending their goods to New York, to this house, and its predecessors, for about twenty-seven years. The law on the subject of invoicing foreign goods, in a case of this kind, is very explicit. As these goods were sent here by the persons who manufactured them, on consignment, for sale on their account, the proceeds to be returned to them, and were not actually sold abroad, the law requires that the invoice shall contain the actual market value of the goods at the time and place when and where they were manufactured. In the present case, in compliance with the law and

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

the instructions from the proper authorities of the United States, one of the partners of this house has made oath, as required by the act of March 3, 1863, that the invoices contain the actual market value of the goods at the time and place when and where the same were manufactured. The definition of the words "actual market value" has been read to you from the decision made by the supreme court of the United States in the case of Cliquot's Champagne. 3 Wall. [70 U. S.] 114. The definition is, that the words "actual market value" mean the price at which the manufacturer holds his goods for sale, the price at which he freely offers them in the market, the price which he is willing to receive for them if they are sold in the ordinary course of trade. That is a definition which commends itself to the good sense of every man. A manufacturer who sends his goods to this country under the circumstances under which the goods in this case were sent, has no right to substitute, in his invoice, anything else for the actual market value. The oaths in this case are, that the invoices contain the actual market value; and the question will be, in the first place, whether these invoices contain the actual market value of these goods at the time and place when and where they were manufactured, and, in the next place, if they do not, whether they were made up by these manufacturers with the intent to evade and defraud the revenue of the United States, or with a knowledge on their part, that they did not contain such actual market value.

There are seven invoices involved in this case, the first of them dated on the 6th of July, 1866, and the last of them on the 28th of August, 1866, covering a space of fifty-three or fifty-four days. The government claims to have shown to you, by the evidence, that there is, in fact, an undervaluation in these invoices, or, in other words, that these invoices do not contain the actual market value, in respect to five different descriptions of ribbons—what are known as patterns 350, 351 and 261, taffetas unis and satins unis L. There are some ribbons of pattern 350 in every one of the seven invoices; and the law is, that if there is a knowing undervaluation in respect to any one item in any invoice, all of the items and goods in that invoice are to be forfeited to the United States, as well as the item in respect to which such undervaluation exists. Of pattern 351 there are some only in invoices 1 and 2; of pattern 261 there are some only in invoices 2, 4, 6 and 7; of taffetas unis there are some only in invoices 1, 2, 3 and 6; and of satin unis L there are some only in invoices 1, 3, 6 and 7.

The expression "actual market value" having been defined to you, there is only one other term in the statute that requires any explanation or definition. The statute requires that, when the goods are obtained in any other manner than by purchase, the invoice shall contain the actual market value thereof at the time and place when and where the same were procured or manufactured. In this case, it must be the actual market value at the time and place when and where the goods were manufactured. The time when an article is manufactured means, under this law, the time when its manufacture is completed—when it is in a condition to have, as a complete manufactured article, a market value; and it does not mean any other preceding stage in the process of manufacture. The testimony of Mr. Daniel Burkhardt is, that these goods were in that state of complete manufacture from one to two weeks prior to the dates of the several invoices. From these views, you will perceive why it is that the law, which requires such actual market value to be inserted in the invoice, does not and will not permit anything else to be inserted in place of such actual market value. It will not permit the actual cost of the goods, with a manufacturer's profit added, to be inserted in the invoice instead of the market value; and this case furnishes an illustration of why such a principle, under this law, never could be admitted. It appears, from the evidence on both sides, that the cost of the raw silk used in the manufacture of these ribbons enters so largely into the expense of manufacturing them, as to constitute from seventy to eighty per cent. of the entire expense of their manufacture, the cost of the dyeing and weaving, and other expenses, in an old settled country, such as Switzerland, being, as a general rule, a fixed sum; that the variation in the cost of manufacture depends upon the variation in the price of raw silk; that, in consequence of the war between Austria and Prussia, in the summer of 1866, there being an interruption of trade, and the demand for ribbons being less, there was a fall in the price of raw silk; and that, after the war closed, in July, 1866, raw silk advanced, because of the prospect of a market for ribbons. Now, if the claimants in this case bought raw silk at its lowest price in May or June, and out of such silk manufactured ribbons, but did not have them completed and ready for market until after the 8th of August, when the witnesses, Mr. Farwell and Mr. Viollier, were at Basle, and by which time the price of raw silk had advanced to a point from twelve to fifteen per cent. higher than its lowest price in May or June, and if the claimants afterward made out invoices of such ribbons, upon the basis of their cost, as made of the raw silk bought at such lowest price in May or June, you will perceive that the cost of the goods so arrived at would not and could not represent their market value at the time when they became a completed manufacture, which is what the law of the United States requires. It would represent the cost of the goods to the manufacturer, undoubtedly, because he was fortunate enough to procure his raw silk when it was low, and to have a market for his manufactured goods some time afterwards, at a price for those goods

based upon an increased price of raw silk. This case, therefore, furnishes a complete illustration of why the United States can never admit that a manufacturer shall invoice his goods at their cost to him with a profit added—at the price that he paid for the raw silk which he puts into the particular goods, with the other expenses of manufacture and a profit added. If any such principle of valuation were to be admitted by the United States, as cost with a profit added, the cost that the United States would have a right to insist upon, in a case like the present, would be a cost based upon a price for raw silk at the advanced rate at which it stood when the goods were completely manufactured, ready for market; otherwise, the United States would be defrauded of its just revenue. But it is not the law that an individual has any right whatever, under any circumstances, to substitute, in his invoice, for the actual market value, cost with a manufacturer's profit added. He must put in the actual market value.

How is the market value to be arrived at? There are three sources of evidence, which have been laid before you by the two parties to this controversy. One source of evidence is actual sales at Basle. Another source is, offers to sell at Basle, made by these manufacturers, to individuals seeking to purchase. A third source of evidence is the cost of the goods, with a manufacturer's profit added. It is in evidence, that the claimants had been in the habit, for some period before the date of the first invoice in question here, the 6th of July, of invoicing to Kutter, Luckemeyer & Co., at New York, goods of the same patterns, qualities, styles, and general assortment with the goods under seizure, at the same prices that are found in the invoices of the goods seized; and I believe that the prices in these seven invoices do not vary at all from each other, for the same quality of goods.

The evidence in regard to actual sales of these goods, as a basis of ascertaining their actual market value, at the time and place when and where they were manufactured, and the manufacture of them was completed, consists, in this case, of three sales, made at Basle, by the claimants—one to a person by the name of Mitschke, residing at Riga, in Russia; another to a German merchant at Leipsic, by the name of Kettembeil; and a third to Tobin, Dixon & Davisson, of San Francisco. You have heard the evidence and the arguments of the counsel for the respective parties in regard to these various sales. I shall not recapitulate the evidence. It is claimed, on the part of the government, that, as compared with the prices charged by the claimants on the sale to Tobin, Dixon & Davisson, of taffetas unis, and satins unis L, the same kinds of goods are undervalued in the invoices involved in this suit—the taffetas unis, to the extent of $12^8/_{10}$ per cent., and the satins unis L, to the extent of 18 per cent. The manner of making the comparison, and

the basis and grounds of it, you have heard discussed by the counsel on both sides. So, also, as compared with the prices charged to Mitschke, it is claimed, on the part of the government, that there was a large undervaluation in the invoices in this suit, and some undervaluation, also, as compared with the prices charged to Kettembeil.

The second class of evidence consists of offers made by Forcart Weiss and Burkhardt Wildt, to sell ribbons at Basle, which are claimed to be like ribbons, in quality and value, and merchantable worth at Basle, with the ribbons in these invoices, those offers being contained in the letters which have been read to you. One was an offer, made in writing, on the 8th of August, 1866, at the time that Mr. Farwell and Mr. Viollier visited the establishment of the claimants, at Basle. In the letter, which the claimants then and there wrote and delivered to Mr. Farwell, they say: "In answer to your request, we have the honor to hand you, herewith, some samples of our three qualities," that is, qualities 350, 351, and 261, "taffetas a lisieres," that is, taffetas with edges, "the prices of which are below. Trusting that our offer, which we have based upon the lowest prices of the raw material, will induce you to give us an experimental order, we present to you, sir, our respectful salutations." Subjoined to the letter are the prices of each of the patterns, 350, 351, and 261, for each of the various widths, the price being stated for each piece of 14.40 metres in length, with a deduction to be made, of 24 per cent., as "bonification d'aunage," or allowance for difference of measure, to reduce the price to the price for each piece of 11 metres, or 12 yards, in length, because the pieces were to be put up in pieces 11 metres in length, instead of 14.40 metres in length. There was, also, to be a further discount, of 20 per cent., and the price was to be payable in three months, with an allowance of 2 per cent., for payment within thirty days of the date of the invoice, an acceptance on Paris to be given, and the goods sent free to Havre. Next, you have the letter of the claimants, addressed and sent by them to Mr. S. D. Jones. Mr. Farwell, over the signature of Samuel D. Jones, wrote, at Geneva, a letter, addressed to the claimants, at Basle, and dated Lyons, August 27th, 1866, and forwarded it to Mr. Viollier, at Lyons. Mr. Viollier posted it at Lyons. It reached the claimants at Basle, and their answer to it, addressed to Mr. S. D. Jones, at Lyons, and dated at Basle, August 30, 1866, was sent to Lyons, through the post office, and was received by Viollier, and was sent by him, with its contents, which consisted of the letter, and of the samples of ribbons referred to in it, to Farwell, at Geneva. In the letter of the 27th of August, to the claimants, the writer says: "Being on my first visit to Europe, for the purpose of purchasing goods for the market in California, I am desirous of comparing the qualities of Basle ribbons, of the cheapest kinds of taffetas unis, with St. Etienne

goods." Taffetas unis is a quality of ribbon not mentioned in the letter of the 8th of August, from the claimants to Farwell. "I shall be in Basle at the close of next week, or early the week after, and hope then to have the pleasure of visiting your house, and perhaps doing some business with you. In the mean time, will you have the kindness to forward to me samples, and your lowest cash prices, for, say, three or four of your lowest qualities of taffetas unis and a lisieres, suitable for country trade in California, in order that I may examine and compare them with others here, and so satisfy myself as to which is the best market for me to purchase in. On my visit to Basle, if I find it possible to do some business with your house, I will furnish you with my references, which will be found satisfactory. Be kind enough to let me know how early you could fill an order for from four hundred to five hundred cartons, in case I should conclude to purchase. Please address me, poste restante, at Lyons." In answer to that letter, the claimants addressed and sent to Mr. S. D. Jones, at Lyons, the letter dated Basle, August 30th, 1866, in which they acknowledge the receipt of his letter of the 27th of August, and say: "According to your demand, we have the pleasure of handing you, enclosed, samples of our two qualities in taffetas unis, and two qualities taffetas a lisieres, whose actual very lowest prices you will find at the foot of the present letter. As we suppose that you will sufficiently know the actual standing of the silk market, when the prices of raw silk are going higher from day to day, you will please to observe that, under those conditions, we cannot engage ourselves to keep you our very lowest prices for some time. To fill an order of 400 to 500 cartons, would require at least two months, as those goods are not ready on hand, but are to be manufactured expressly on order. Expecting your kind visit for next week, we shall be glad to hear from you, that our offers will give you occasion to a satisfactory business." Appended to this letter, were the prices of two qualities of taffetas unis, and of patterns 350 and 351, for the various widths of each, for pieces 14.40 metres in length, with 20 per cent. discount, payable at three months, with an extra discount of two per cent., for cash, goods free to Havre. It is claimed, on the part of the government, that the prices stated by the claimants, in these letters of the 8th of August and the 30th of August, are considerably higher than the prices stated in the invoices of the goods under seizure, for articles of like description, quality, pattern, and value.

If you believe, from the evidence, that the claimants, when they wrote those letters, and delivered or sent them to Mr. Farwell or Mr. Jones, believed that Mr. Farwell and Mr. Jones, respectively, came to them as customers, in good faith, intending to purchase ribbons, and if you believe that the offers made by the claimants, in these letters, were bona fide offers to sell the goods named therein, upon the terms named therein, you have a right to regard such offers, if they refer to goods like those under seizure, as evidence to be taken into consideration by you, in determining the question of the actual market value of the goods under seizure, at the time and place of the manufacture of those goods.

The law, in all departments of its administration, in courts of justice, always requires the best evidence to be produced of any fact. In regard to the actual market value of merchandise abroad, a series of sales, general in their character, not accompanied by any exceptional circumstances, tending to make any one or more of such sales higher or lower than it would be but for such exceptional circumstances, or even a single sale, in the ordinary course of trade, is one of the best evidences of market value. So, also, offers by merchants or manufacturers to sell their goods to persons who are supposed by them to come as buyers, in good faith, such offers being made in the usual course of trade, under such circumstances as generally attend the sale of merchandise, are among the best evidences of the actual market value of the goods in respect to which the transactions take place. It is only when such evidence is wanting, in a case of this kind—it is only when you are unable to arrive at the actual market value of the goods, from actual sales of similar goods about the same time, or from offers to sell, made under the circumstances which I have specified as necessary, in respect to the same goods, or goods of the same quality, that you have a right to resort to an inferior class of evidence, as evidence of market value—that is, to the cost, with a manufacturer's profit added. But, as I said before, if, in this case, you shall consider that there is no evidence of actual sales, at Basle, of goods like those under seizure, and no evidence of offers by the claimants to sell, at Basle, similar goods, from either of which you can arrive at a conclusion as to the actual market value, at Basle, of the goods in the invoices in question, and if you shall then have to resort to the cost of the goods, with a manufacturer's profit added, you will not be authorized to compute such cost on the basis of the cost of the raw silk to the claimants, if you shall find that the claimants were paying for raw silk a higher price, at the time of the completion of the manufacture of the goods, than the actual cost to them of the same quality of raw silk, which went into the manufacture of such goods. The government is not bound to accept such low cost of the raw material. It is entitled to the benefit of the price of the raw material at the time when the goods were completed in their manufacture.

It results, therefore, that if the invoices, or any of them, of the goods under seizure,

were made up by the claimants with an intent, by a false valuation of the goods described in them, to evade the payment of any part of the duties chargeable by law thereon, the goods contained in any invoice so made up are forfeited, and your verdict must be for the United States, as to such invoice. So, too, if you shall find that the goods seized, or any of them, were entered by means of an invoice which did not truly state the actual market value of the goods, or of any of them, named therein, at the time and place when and where the same were manufactured, with the knowledge, on the part of the claimants, that such invoices did not contain such actual market value, all the goods so entered are forfeited, and your verdict must be for the United States. There are, therefore, two questions for your consideration. You will, in the first place, inquire whether the actual market value was, in point of fact, higher than the value stated in the invoices to be such market value. If you shall find that it was not, and that the invoices were not undervalued, your verdict will be for the claimants. But, if you shall find that the invoices were too low, you will have to go into a further inquiry, whether such undervaluation was made, on the part of the claimants, knowingly, or with an intent to evade or defraud the revenue of the United States. If you shall find that it was not, your verdict will be for the claimants. But, if you shall find that it was, your verdict will be for the United States.

The market value to which the claimants were required to conform the valuation in their invoices, was the actual market value of the goods, or of goods of the same description and quality, at Basle, at the time of the completion of the manufacture of the goods, which was, according to the testimony, within a week or two before the date of each invoice. The law presumes that there was, at the time and place of the manufacture of the goods seized, an actual market value thereof; and no evidence can be received or considered, under the law, and under the oaths to the invoices, to show there was not, in fact, such actual market value thereof. The cost of the goods will come under consideration, if at all, not as a substitute for market value, but merely as an item of evidence on the question as to what was the actual market value. Therefore, you must assume, in this case, that there was an actual market value for these goods, at the time and place of their manufacture, the only question being to ascertain what such actual market value was. The claimants had no right to adopt any other standard of value than such actual market value, nor do I understand them as claiming that they had such right. They have sworn, in the oath on each invoice, that such invoice contains the actual market value; and their claim is, not that they had a right to set

forth anything except the actual market value, but that the actual market value was the cost, with the manufacturer's profit added, at the percentage named in the testimony, and that such actual market value was no greater, according to their idea of actual market value. So, also, the claimants were required to state, in their invoices, the actual market value of their goods, at the time and place of their manufacture, not only without regard to the cost thereof, but without regard to the profit or loss which might result from their consignment thereof, or any loss which may be shown, in the end, to have resulted therefrom. If they chose to take the cost, and add a profit, and made up the actual market value in that way, and it turns out, in the end, that that is the actual market value, very well; but, if it turns out, in the end, that that is less than the actual market value, the claimants cannot maintain, under the law, that they had a right to put in place of the actual market value, the cost, with the manufacturer's profit added. Nor is the manufacturer relieved or excused from stating in his invoice such actual market value, or justified in adopting any other standard of value, because he may not himself make sales at home of similar goods, but may consign all such goods for sale to foreign markets. Although he may adopt such course of trade, he is, nevertheless, required to state, in his invoices, the actual market value of such goods, at the time and place of their completed manufacture; that is, the price at which he holds such goods for sale, at such time and place, the price at which he, then and there, freely offers them in the market, such price as he is, then and there, willing to receive for them, if they are sold in the ordinary course of trade. As I stated to you before, but perhaps not quite fully enough, you must, in considering the question of individual sales of similar goods, such as the sales to Mitschke, Tobin, Dixon & Davisson, and Kettembeil, inquire whether they were made in the ordinary course of business, or whether the circumstances under which they were made were such as to make them sales exceptional in character, and not a fair index of actual market value. So, in regard to offers to sell goods, such as are contained in these letters of the 8th and 30th of August, they are competent evidence, from which you may find actual market value, if you shall believe that they were fair ordinary business offers, made in good faith, and under the belief, on the part of the claimants, that the party to whom they were made was intending to become, and might become, a purchaser; and the circumstance, that the party to whom they were made did not, in fact, intend to purchase, is wholly immaterial. The question is, the state of mind, and the belief and intent, of the claimants, not what was intended by Jones or Farwell. The test is, whether the claimants believed that Farwell and Jones came

to them in good faith. intending to become purchasers.

In determining the question of knowledge or intent, on the part of the claimants, in the undervaluation of their goods in the invoices, if you shall find that such undervaluation was made, the question for consideration will be, whether such undervaluation was made knowingly, that is. with a knowledge, on the part of the claimants. that the value stated ought to have been higher, in order to be the actual market value, or designedly, or whether it was the result of honest mistake. or an accident. If you shall find that it was made knowingly. or designedly, your verdict must be for the United States; otherwise. for the claimants. So, also. if you shall find that the claimants knowingly or designedly stated, in any invoice, a value less than the actual market value, knowing what that actual market value was. and that it was greater than the value stated in the invoice, it makes no difference as to what was the motive, or the reason. or the process of reasoning, on the part of the claimants. upon or by which they arrived at the value stated in the invoice.

It is the law, and has been ever since the year 1799. that, in cases of this kind, where the court decides that probable cause is shown for the seizure of the goods, the burden of proof is upon the claimant to clear up the suspicion thrown around the case, and to show that the invoice contains the actual market value of the goods. In the present case, the burden of proof is upon the claimants, to show affirmatively, by evidence satisfactory to you, either that the goods seized were, in fact, invoiced at their actual market value, or, in case they were not so invoiced, that the undervaluation was not made knowingly or with a design to evade or defraud the revenue. but was made by an honest mistake or by an accident. If. upon the whole evidence, the claimants have not proved. to your satisfaction, either that the goods were invoiced at their actual market value. or that the failure to so invoice them was the result of an honest mistake, or of an accident, your verdict will be for the United States; otherwise, for the claimants. Any undervaluation, however small, made knowingly or intentionally, will entitle the government to your verdict. and any undervaluation so made, in respect to any one item in any invoice, will authorize a forfeiture of all the goods contained in the same invoice.

The questions of fact in this case, which have been so elaborately argued by the counsel on both sides, I shall leave entirely to your consideration. They are questions exclusively for you, under the rules of law which I have stated. Impressing upon you the importance of this case to the United States, in respect to the principles involved in it, and reminding you of the equal duty, that is incumbent upon you. to stand between the United States and individuals resident abroad, if they have made an honest mistake, looking, as they do, equally with the government. to you and to your action for shield and protection. and satisfied that you will give to the case patient and attentive deliberation, and apply it to the rules of law which I have laid down, I commit it to your arbitrament.

The jury were discharged. without having been able to agree on a verdict.